FILED

SEP 1 2 2018

U.S. DISTRICT COURT
EASTERN DISTRICT OF MO
ST. LOUIS

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. S2-4:17-cr-00556 SNLJ NAB |
| ) | |
| MARLON CALDWELL and ) | |
| MARK TAYLOR, ) | |
| ) | |
| Defendants. ) | |

### SECOND SUPERSEDING INDICTMENT

The Grand Jury charges that:

### COUNT 1
### THE CONSPIRACY AND ITS OBJECTS
### 18 U.S.C. § 371

### BACKGROUND

### The Defendants

1.      Defendant Marlon Caldwell ("Caldwell") was a police officer for the St. Louis Metropolitan Police Department ("SLMPD") from about 1990 to his retirement on or about January 3, 2011.

2.      Defendant Mark Taylor ("Taylor") was a SLMPD police officer from 1990 to 2018.

### The Other Co-conspirators

3.      Co-conspirator Cauncenet H. Brown ("Brown") was a SLMPD police officer from in or about 2003 to 2011 and again from 2013 to 2015.

4.      Co-conspirator Terri Owens has been a SLMPD police officer since 1992.  She has been on unpaid leave since February 2, 2017.

5.      At all times relevant to this indictment, Co-conspirator Dr. Davis was a chiropractor, licensed to practice in Missouri.  Dr. Davis owned and operated Davis Chiropractic, a chiropractic clinic located at 4144 Lindell Avenue, in St. Louis, Missouri.  Davis Chiropractic is now known as City Health & Chiropractic, but will be referred to as Davis Chiropractic in this indictment.

6.      Co-conspirator Galina Davis is the wife of Dr. Davis.  At all relevant times, Galina Davis assisted Dr. Davis in a number of ways, including but not limited to identifying, soliciting, and scheduling prospective patients for Davis Chiropractic.  Galina Davis has used several first names, including "Gail," when communicating with others.

### Saint Louis Metropolitan Police Department

7.      At all times relevant to this indictment, the SLMPD was an agency of a state or local government that received federal assistance in excess of $10,000.  At all relevant times, police officers, employed by the SLMPD, were agents of the SLMPD.

<u>SLMPD Rules Governing Disclosure of Police Information by SLMPD Officers</u>

8.      The SLMPD collects, inputs, and maintains information and documents in its computerized records management system.  The SLMPD gives police officers access to the computer systems, in order that they may perform their assigned duties.  However, SLMPD officers are repeatedly reminded that they may not disclose police information, except in the manner authorized by SLMPD.  The following warning appears each time a police officer accesses a SLMPD computer:  "**WARNING:**  Use of this computer is restricted and monitored. . . . The computer systems are to be used solely for business purposes of the Department and not for personal purposes of the employees. . . . All information and messages created, sent,

received or stored on the Department's computer systems are the sole property of the Department."

  9. The SLMPD Manual also contains rules instructing police officers that they may not disclose police information.   Specifically, Rule 9.002(A)(7) states: "no police information, of any nature, will be disclosed unless it is proper and necessary, under the circumstances." Rule 9.501(A)(4) emphasizes that all "records retained by [SLMPD], whether created internally, or obtained from any other source" are closed to the public to the extent allowed by law.  Thus, no individual police officer is authorized to disclose information that SLMPD has determined not to disclose.

  10. Further, if a SLMPD police officer receives money to disclose police information, the officer violates both Rule 9.002(A)(7) and Rule 7.  This latter rule, entitled "Complaint and Disciplinary Procedures," identifies a number of actions that subject police officers to discipline.  Among the prohibited activities are:  (a) "Using an official position for personal gain," (b) "Receiving money, gifts, gratuities, rewards or compensation for services rendered or expenses incurred, except while engaged in approved secondary employment . . . ," and (c) "Failing to devote one's time and attention to the business of the Department during scheduled duty hours."

Specific Policy Concerning Disclosure of SLMPD Accident Reports

  11. Included within the SLMPD computer systems are reports of accidents that occurred in St. Louis City.  The rules and regulations prohibiting the disclosure of police information for personal purposes obviously applies to the accident reports contained in the SLMPD computer system.

12.     However, in addition to the rules and regulations discussed above, the SLMPD

has a detailed written policy ("Policy") on its official website (www.slmpd.org).  This Policy

identifies the categories of persons and circumstances under which the SLMPD will release

complete accident reports.  Complete, or un-redacted accident reports, contain detailed

information about the occupants of the vehicles, including their full names, addresses, telephone

numbers, insurance providers, and insurance policy numbers.

13.     The Policy, entitled "Criminal Incident and Accident Reports," expressly provides

that only the Records Division is authorized to release accident reports.  The Policy states in

part:  "Police reports are available through the Records Division as a convenience to victims.

The primary goal of the Records Division when releasing police reports is to protect the rights

of those named in the report."  The Policy limits the Records Division's disclosure of complete,

un-redacted accident reports to individuals involved in automobile accidents, family members if

the person involved in the accident is deceased or incompetent and the family provides written

proof, the companies insuring them, and the attorneys representing them.

14.     At all times relevant to this indictment, individuals not involved in accidents

could only purchase redacted SLMPD accident reports and had to pay a $6.50 fee for each

report.  The redacted SLMPD accident reports did not include information, such as addresses,

birth dates, insurance information, and phone numbers of the persons involved in the accidents.

The redacted reports only included the names of the individuals involved in the automobile

accident, accident report numbers, and vehicle information (i.e., make, model, and year of

vehicle).

## DESCRIPTION OF THE CONSPIRACY

15.     From in or about 2007 to in or about 2016, in the Eastern District of Missouri and elsewhere,

### MARLON CALDWELL and
### MARK TAYLOR,

the defendants herein, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together, and with each other, to commit offenses against the United States, that is, to corruptly solicit and demand, to accept and agree to accept, to offer and give anything of value, for the benefit of any person, with the intent to influence and reward an agent of an organization and of a state and local government, and any agency thereof, in connection with any business, transaction, and series of transactions of such organization, government, and agency involving anything of value of $5000 or more, in violation of 18 U.S.C. §§ 666(a)(1)(B) and 666(a)(2).

### Purpose Of The Conspiracy

16.     The purpose of the conspiracy was for the defendants and their co-conspirators:

a.      to solicit, offer, accept, and pay police officers to disclose accident reports, contrary to the SLMPD's policy governing the disclosure of un-redacted accident reports;

b.      to obtain contact information for accident victims from police officers and to use the information to solicit accident victims to receive services at Davis Chiropractic; and

c.      to receive a financial benefit from the disclosure and use of the contact information of accident victims.

### Manner And Means Of The Conspiracy

17.     It was part of the conspiracy that Galina Davis and Dr. Davis devised a number of means to obtain un-redacted accident reports and the information contained in the reports,

5

although they knew that the SLMPD would not disclose the un-redacted reports and information to them.  Dr. Davis and Galina Davis used the information in the un-redacted reports to contact accident victims to persuade them to receive services from Dr. Davis and Davis Chiropractic. The insurance settlements for accident patients treated by Dr. Davis and Davis Chiropractic generally ranged between $1500 and $50,000.  Dr. Davis and Davis Chiropractic typically received about $2000.00 for each accident patient to whom Davis Chiropractic provided services.

18.     It was further part of the conspiracy that for a time, Galina Davis and Dr. Davis directed their employees to go to the SLMPD to obtain the un-redacted accident reports.  Galina Davis and Dr. Davis gave the employees letters, bearing the name of a law firm, to present to the SLMPD.  By so doing, Dr. Davis and Galina Davis falsely represented that their employees were employees of a law firm, representing the accident victims.

19.     It was further part of the conspiracy that Dr. Davis contacted lawyers and offered to refer patients to them, if they would identify a SLMPD police officer or other SLMPD employee to give them the un-redacted police reports.

### Bribe Payments to SLMPD Police Officers

20.     It was further part of the conspiracy that from at least as early as 2007, Galina Davis and Dr. Davis directly and indirectly paid police officers for un-redacted accident reports and information contained in the reports, although they knew that the police officers were prohibited from providing un-redacted accident reports to them.  The police officers provided the information in various ways, including but not limited to writing out the information, printing the accident reports, and using a cell phone to take and send photos of the reports to Galina Davis.

6

Some of the police officers who participated in this conspiracy with Galina Davis and Dr. Davis are identified below.

<u>Police Officer Marlon Caldwell</u>

21.     Defendant Caldwell received payments from Galina Davis for accident reports and information.  He provided the reports and information for a number of years prior to his retirement from the SLMPD on or about January 3, 2011.

22.     Further, on several occasions, Caldwell assisted Galina Davis in identifying other police officers who would provide the accident reports and information in return for payments from Galina Davis.  As an example, in 2016, Galina Davis contacted Caldwell when she needed help finding a police officer to provide the type of accident information that Caldwell had previously provided.  Galina Davis offered, and Caldwell accepted, a $1000 payment from Galina Davis to identify a police officer who would give Galina Davis information contained in un-redacted accident reports.

<u>Police Officer Cauncenet Brown</u>

23.     Co-conspirator Brown received payments from Galina Davis for providing accident reports and information to Galina Davis from about 2007 to in or about November 2011 and again from in or about 2013 until she left the SLMPD for the last time, in or about 2014.  While at the SLMPD, Brown knew and worked with Co-conspirator Terri Owens.  Before Co-conspirator Brown left the SLMPD in 2011, she told Terri Owens that she could make some money by providing information in the un-redacted accident reports to Galina Davis.  Co-conspirator Brown told Terri Owens that she should contact Galina Davis, if she was willing to provide the information to Galina Davis.  When Brown returned to the SLMPD in or about 2013,

she again received payments from Galina Davis in return for disclosing un-redacted accident reports.

Police Officer Terri Owens

24.     After talking with Brown, Terri Owens agreed to provide the accident reports to Galina Davis.  Terri Owens received payments from Galina Davis for accident reports and information from in or about 2011 to in or about October 2016.

25.     On hundreds of occasions, Terri Owens used her user name and identification number to log into the SLMPD computer system to obtain information for Galina Davis.  As an example, between February 15 and February 26, 2016, Terri Owens pulled up and viewed 186 accident reports, which Galina Davis later requested.

26.     Galina Davis paid Terri Owens cash, from about $6.50 to about $10.00, for each accident report.  The amount varied based on the number of reports and based on whether Galina Davis received printed copies of the reports.

Police Officer Mark Taylor

27.     Defendant Taylor was introduced to the conspiracy by Defendant Caldwell, who received $1000.00 from Galina Davis after Taylor agreed to participate in the conspiracy.  Galina Davis paid Taylor $7.00 for each un-redacted police report that he sent to her.

**Conspirators' Recorded Communications**

28.     It was part of the conspiracy that Galina Davis, Dr. Davis, and their co-conspirators regularly communicated by phone and through text messages about payments to police officers for the accident reports and information.  Portions of these communications -- between Galina Davis and Dr. Davis and between Galina Davis and police officers -- are set out in the following paragraphs.

8

**Text Message from Terri Owens to Galina Davis**
**10/12/16 at 9:28 a.m.**

29.     On October 12, 2016, Terri Owens told Galina Davis that she would no longer

provide the un-redacted police reports or information from the reports.  In a text message, Terri

Owens stated: "Gail, I cannot get the reports anymore.  I'm done.  Don't make anymore

requests." This text message caused Galina Davis to begin a frantic search for a police officer to

replace Terri Owens.

**Call between Galina Davis and Officer Joe**
**10/12/16 at 9:35 a.m.**

30.     Within minutes of receiving the text message from Terri Owens, Galina Davis

called another SLMPD police officer, whom Galina Davis called "Joe" ("hereafter Officer Joe").

Galina Davis told Officer Joe that Defendant Caldwell had provided Officer Joe's phone number

to her about a month before.  Caldwell said he might be willing to provide accident reports.

Officer Joe stated that he was not interested, even after Galina Davis said it was "good money."

The recorded conversation between Officer Joe and Galina Davis is set out below.

**Joe**: Hello

**Galina Davis**: Hi, is this Joe?

**Joe**: Speaking.

**Galina Davis**: Hey, um, Marlon gave me your number.  I'm not sure if he told you, um,

this is Gail and I talked to Marlon a few, maybe a month ago, not sure, did he tell you?

He gave you, he gave me your number?

**Joe**: Uh, thought I remember something.

**Galina Davis**: Did he say anything?  You do remember something ok.  Um, I, we worked

with Marlon.  I want to say two, maybe three, maybe four, I don't know it's been, maybe

9

four years ago.  I don't know, when he used to work at the police department.  Um, which he no longer does.  He gave me your name, said that you still work be able to maybe help us? Did he mention anything?

**Joe**: Uh, yeah, I was telling him, I told him that I wouldn't be able to do that for you.

**Galina Davis**: Do you know anyone that might be able to?

**Joe**: Um, not off hand I don't.  I could ask around to see if somebody would like to, but yeah, not off hand I really don't know.

**Galina Davis**: Well I mean, not like running around looking for it, just anybody in mind that you could think of?

**Joe**: Nah, nobody off the top of my head right now, no.

**Galina Davis**: And, and you are not interested why?

**Joe**: Why?

**Galina Davis**: Um hm

**Joe**: Cause I'm not.  I'm not interested.

**Galina Davis**: I mean its good money.

**Joe**: I know.  I'm not interested.

**Galina Davis**: Alright thanks.

**Joe**: Alright.

**Call between Galina Davis and Marlon Caldwell**
**10/12/16 at 9:38 a.m.**

31.   After Galina Davis talked to Officer Joe, she immediately called Defendant Caldwell and told him that Officer Joe was not interested in providing the accident reports and information.  The following are excerpts from the recorded conversation between Galina Davis and Caldwell:

**Galina Davis**: Hey, it's Gale, um, Joe said he is not interested.  Do you have anybody else in mind at all?

**Marlon Caldwell**: Not, not not, not off hand. . . .Yeah, I've been gone, its going on 6 years now.

**Galina Davis:** I know . . . but you have probably buddies working there.  You knew Sunny [Co-conspirator Brown] and Terri Owens that were interested.  I don't know something is going on with Terri Owens.  I'm not even sure what it is in all honesty.  Something is going on though.  She is totally different, different person.  Maybe.

**Marlon Caldwell**: Yeah.  I'm trying to think outside of Joe I mean Joe was the perfect person because he cause of his shift, but outside of him my other buddies

**Galina Davis**: I don't know why he is not interested….

**Marlon Caldwell**: Yeah.  I don't know what to tell ya.

**Galina Davis:**  Do you have anyone else in mind?

**Marlon Caldwell**: I've been gone for 6 years, so I am not really in touch with anybody.  Wish I could help you, but I am out of the loop now.

**Galina Davis**: Ah, I need to find someone, like ASAP.  I thought I could count on you for sure.  Don't you have anybody? Because that is easy money.

**Marlon Caldwell**: If I can think of somebody I will give you a ring back.

**Galina Davis**: Alright.  Thanks.

### Call between Galina Davis and Dr. Davis
### 10/12/16 at 9:40 a.m.

32.     After her calls to Officer Joe and Defendant Caldwell, Galina Davis contacted Dr. Davis.  Galina Davis told Dr. Davis that Terri Owens would no longer provide the accident reports and she had no one else who was willing to provide the reports.  Galina Davis also told

Dr. Davis that she had contacted Officer Joe, as suggested by Defendant Caldwell, but Officer

Joe was not interested.  Galina Davis said that Officer Joe was a good candidate because he had

access to police reports and worked in an office at the SLMPD.

33.     Dr. Davis told Galina Davis that he had a list of police officers who might be

interested in taking Terri Owens' place.  Dr. Davis then gave Galina Davis the name and phone

number of Police Officers Brandon Brown and Laqueshia Lewis.  The following are excerpts

from the recorded conversation between Galina Davis and Dr. Davis:

**Galina Davis:** [W]e are in big trouble, Terri Owens said that she longer wants to do

anything.  I called the person that Marlon gave me, he's not interested at all.  He doesn't

want to discuss it, he's says I'm not doing it.  I don't have anyone else.  I mean I called

Marlon back.  He doesn't know anybody else because he said I been out of it for six

years.  I have no idea.  And I'm like totally clueless.  What are we doing?  I don't even

know if I can get the ones I requested already.  I mean I paid her like, six days worth.

**Dr. Davis:** Why . . . is she quitting?

**Galina Davis:** I don't know.   . . I don't know if had something going on in her life, or if

they, she got in trouble.  I don't know.  She didn't want to write them, then she was

printing them.  And now she just texted me don't ask anymore I'm not doing it anymore.

And she wouldn't tell me what it is.  She just texted me.

**Dr. Davis:** I mean, I have possible people you could call from years ago.  I don't know if

the numbers are the same, I wrote in my little book.  You you know who you wanna

contact.

**Galina Davis:** What's a correctional officer?

**Dr. Davis:** They have access?

**Galina Davis**: I don't know.  I don't even know what that is.  I mean, where do they work? Cause you have someone coming today.  She is a correctional officer it says on the police report.  On the, on the Sorrell thing.  I don't know correctional officers have any access to that stuff. . . . .

**Dr. Davis**: I have stuff from years ago.  People to call just in case, they might be interested.

**Galina Davis**: How do you know they are interested?

**Dr. Davis**: Um, well they might not be, or maybe they expressed an interest, years ago.

**Galina Davis**: Marlon said that Joe would have been perfect.  I don't know, he was shocked that he doesn't want to do it, cause he's like, he sits in the office and he deals with police reports.  Like he was the perfect candidate, but he said nope, not doing it. Don't want to do it, not interested.  I just called him. …

**Galina Davis**: Remember that Steve guy did it, Steven, son of somebody, Mike Stevenson or somebody Stevens, do you remember that?

**Dr. Davis**: Yeah, cause former patient officer, Laquisha Lewis, you want her number?

**Galina Davis**: What am I, what am I gonna say? Who am I?

**Dr. Davis**: Just say, just say, you . . . looking for an officer to do some research for you. And um, I don't know, you could, well uh, well, I guess you could mention my name, but I don't know, I don't think, she's a former patient and a police officer.

**Galina Davis**: Why do you think she would be a good candidate?

**Dr. Davis**: Well you could ask her, I don't know, cause she's a former patient.  I might even have asked her at one time or maybe not, that she might be interested.  I wrote down her number.  . . .

13

**Dr. Davis:** I guess you can say you're with me.  I can always say I didn't know anyway. I might have some stuff in my old book.

**Galina Davis:** How do we get her? Do we call her?

**Dr. Davis:** You have to call her.  You don't have a choice. . . .

**Galina Davis:** This is a shock, I didn't expect her to quit.  She needs the money all the time.  I don't understand. Something must have happen.

**Dr. Davis:**  She sure she doesn't want to change her mind? Why don't you give her a raise? It's more money.

**Galina Davis:** I can't even talk to her.  She just texted me.  I just got a text.  So I called Marlon.  I mean I call Joe cause he gave me the number before.  As for him, he said he's not interested.  I called Marlon.  I'm like ok, do you have anybody else in mind? He said no.

**Call between Galina Davis and Police Officer Laqueshia Lewis 10/12/16 at 9:58 a.m.**

34.     Within minutes of the above conversation with Dr. Davis, Galina Davis called Officer Laqueshia Lewis.  Officer Lewis told Galina Davis that she would have to go through the SLMPD to get the reports and that SLMPD did not give out certain information.  The following are excerpts from this recorded conversation between Galina Davis and Officer Lewis:

**Galina Davis:** Um, we actually doing research and stuff like that.  Um, I'm looking for a police officer that is able to get some police reports for us.

**Officer Lewis:** [T]here are things blacked out in the reports.  I couldn't just print them off and give you them.  Certain things we don't give out people's social security number, pertinent information like that.  So, if you are needing a police report.  There are some things that aren't going to be on there.

14

**Galina Davis**: I see.  And we can't get the whole copy? You wouldn't be able to do that?

**Officer Lewis**: No.  No.

## Call between Dr. Davis and Galina Davis
## 10/12/16 at 10:00 a.m.

35.      Galina Davis had a subsequent discussion with Dr. Davis about her contacts with the police officers.  Dr. Davis suggested that Galina Davis contact Officer Lewis and offer her money.  He stated that he could not call Officer Lewis because "She will just tell on me . . ." The following are excerpts of the recorded conversations between Galina Davis and Dr. Davis:

**Galina Davis**: So, I spoke to this Laquisha Lewis.  She's . . . like well, in order for you to get a police report you have to get to the police headquarters and get a police report, and certain things will not be available to you because they are blacked out.  I said I'm aware of that, but can you get us the whole copy.  She said no.  Like she was, like pissed off that I am asking her that.  . . .

**Dr. Davis**: Oh, she, she don't want to make money? …

**Dr. Davis**: Well you need to offer her money to give you.  Say you know it's blacked out, that's why I am paying you so you can look it up for me.  I want to pay you.  You didn't say that?

**Dr. Davis**: Well tell her you're going to pay her for the phone numbers.  You just want the phone numbers.

**Dr. Davis**: What do you want me to do? I can't be calling her. She will just tell on me. . .

**Dr. Davis**: Well, say I'm sorry, but you know, I wasn't clear.  Just say, um, what I need you.  Let me just make it clear.  What . . . I want you to do is look up phone numbers that are blacked out.  Just say it like that, and addresses you know that lawyers need to get in

touch with people.  Then she'll say yes or no.  You got to at least give her the pitch, you

know?

**Galina Davis:** Ok.

## Phone Message from Galina Davis to Officer Lewis
## 10/12/16 at 10:10 a.m.

36.     As she and Dr. Davis had discussed, Galina Davis called Officer Lewis to offer

her money for the reports.  Officer Lewis did not answer and Galina Davis left the following

message: "Hi, Miss Lewis.  Sorry to bother you again.  Could you please give me a call when

you get this message?  My name is Gale.  494-6064.  I do have another question.  Thanks."

## Call between Dr. Davis and Galina Davis
## 10/12/16 at 12:15 p.m.

37.     Later on October 12, 2016, Galina Davis again contacted Dr. Davis and told him

that Defendant Caldwell had not identified anyone.  Galina Davis asked Dr. Davis if she should

offer Caldwell money.  Dr. Davis agreed and stated that Galina Davis should offer Caldwell

$1000 as an incentive.  The following are excerpts of the recorded conversations between Galina

Davis and Dr. Davis:

**Galina Davis:** I was going to say, Marlon doesn't have, you know, . . . there's no

incentive for him to find somebody.  He's not getting anything out of it.  Should I offer

him some money?

**Dr. Davis:** Yeah, sure go do that.

**Dr. Davis:** Offer him, ah, offer him a thousand, cash

**Galina Davis:** Seriously, that much?

**Dr. Davis:** Yeah, it's good idea.  That way he'll be looking too.

**Text Message from Galina Davis to Marlon Caldwell**
**10/12/16 at 12:32 p.m.**

38.     After this phone call with Dr. Davis, Galina Davis left a text message for

Defendant Caldwell:  "Call me.  I have an offer for you."

**Call between Galina Davis and Officer FNU Davis**
**10/12/16 at 1:20 p.m.**

39.     Later, on October 12, 2016, Galina Davis called a police officer, whose last name

was "Davis" ("Officer Davis").  Galina Davis told Officer Davis that she had come across her

phone number on a card and decided to call her.  Officer Davis told Galina Davis that she would

have to go to the SLMPD records section to get the information she wanted.  The following are

excerpts from the recorded conversation between Galina Davis and Officer Davis:

> **Galina Davis:**  Sure, I mean, I'm sorry, I'm looking for a police officer to work with, and
>
> that how I got your number . . . we were looking for a police officer.  We are doing some
>
> research trying to get some information that we need, um, from police reports.  Would
>
> you be able to do that?
>
> **Officer Davis:**  Naw.
>
> **Galina Davis:**  Obviously we will pay you.
>
> **Officer Davis:**  No, I can't do that.

**Call between Galina Davis and Dr. Davis**
**10/12/16 at 2:46 p.m.**

40.     During a later call on the same day, Galina Davis asked Dr. Davis whether he had

information on a correctional officer.  They had earlier discussed the possibility that this

correctional officer could access the accident reports.  During the conversation, they also

discussed other police officers who had provided the accident reports to them in the past.  The

following are excerpts from the recorded conversation between Dr. Davis and Galina Davis:

**Galina Davis**:  You find out about the correctional officer or anything?

**Dr. Davis**:  Yeah, yeah she doesn't have access to that.  She is a corrections officer.  I asked her.

**Galina Davis**:  So, does she know any police officers?

**Dr. Davis**:  No she doesn't know any. . . .

**Galina Davis**:  I just found a card with a few, a few officers on there and I called them . . .

**Galina Davis**: . . . I said are you a police officer?  He's like, yeah . . . Like no, I'm not interested.

**Dr. Davis**:  Well, that didn't help me at all.  . . .

**Dr. Davis**:  Well I might have some, I might have some names, um, but there in my old thing.  3 years ago we had trouble with people, I uh, I uh had some.

**Galina Davis**:  What about Stevenson?  He did it for a little bit.  Maybe he'll be interested in doing it again.

**Dr. Davis**: . . . Yeah he said he didn't want to do it anymore.  I thought Ladareus, the real tall guy, you remember?

**Galina Davis**:  He didn't want to do it anymore … hey, you don't know, maybe he also change his mind.  Maybe he'll do it, I, I mean, we wouldn't be able to count on him for the long term.

**Dr. Davis**:  Well we can check, I don't, I guess you can look up his phone number.  His name like [L.S. or S.], you remember?

**Galina Davis**:  Yeah.

**Dr. Davis**:  He did it a few times . . . he's a police officer.

18

**Dr. Davis**:  . . . did you tell him [Marlon] you'd give him a thousand ? . . .

**Dr. Davis**:  That might give him an incentive . . .

**Call between Dr. Davis and Galina Davis**
**10/12/16 at 4:49 p.m.**

41.      Late in the afternoon on October 12, 2016, Dr. Davis called Galina Davis and they continued to discuss other methods of obtaining un-redacted police reports.

**Dr. Davis**: Yeah, I told [lawyer J.W.] if he comes through for me, I will give him like five times as many [automobile accident victims]. He knows everyone in the city [of St. Louis]. He grew up here. He says it shouldn't be a problem . . . hello?

**Galina Davis**: He says it's not going to be a problem?

**Dr. Davis**: No. He says he thinks that he can find someone. I told him I would send him more business. . . . I'll will send him five times as many people.

**Galina Davis**: What did you tell him you need?

**Dr. Davis**: Ah, someone who's to look up the phone numbers. I said we would give him the police report numbers, date of accident, person's name. We just need the phone number. He said the whole report? I said, well, that's better, but you don't have to. We just need the phone numbers, right?

**Galina Davis**: And address.

**Dr. Davis**: We need the address? You don't have to have the address.

**Galina Davis**: Yeah, I need the zip codes.

**Dr. Davis**: Okay, well, well, you, when you talk to the officer, you'll will tell them that.

**Galina Davis**: I would love to get a whole report.

19

**Call between Galina Davis and Marlon Caldwell**
**10/13/16 at 11:09 a.m.**

42.      On or about October 13, 2017, Defendant Caldwell returned Galina Davis' earlier

call. During the conversation, Galina Davis offered to pay Caldwell $1000 if he could find a

police officer who would give them information from the accident reports. The following are

excerpts from the recorded conversation between Galina Davis and Caldwell:

**Galina Davis**: Hey, I was thinking, you know obviously you have, not, no incentive to

even try, um, we'll give you, we'll give you a thousand bucks if you find somebody who

can, who can do this for us.

**Marlon Caldwell**: I mean, ah, how much, ah I don't what'ch you're given them how

much, how much they gonna be get'n charged?

**Galina Davis**: Well, here's the thing, I mean, it depends on what I'm getting because

lately, um, Terri Owens didn't want to be writing them down, Ok, it was easier just to

print 'em out. But it's a lot, it's a lot. It really is and . . . so it depends what kind of

position they have if they have it like maybe like you're telling me Joe would have been a

good, good you know person to do it because he sits in an office and he deals with reports

or something.

**Marlon Caldwell**: Oh, he's got a lot of down time on his hands.

**Galina Davis**: Ah, well I get them in the city but I get them blacked out, don't you

remember or maybe when I was doing it with you I don't remember when it was, it's

been years, they give me a report but there's no information that I need on it. . . .

**Galina Davis**: I mean, . . . ah we paid five bucks for if they want to write 'em down.

Remember? And, if it's more than five names, then they print 'em out and I pay 'em ten

for each report. Now, when Terri Owens was doing it, she didn't want to write 'em

down, She was just printing 'em.  I was just paying her $6.50 like I would pay, pay the

city, $6.50 per report when she prints them, because there was so many I mean.

**Marlon Caldwell**: Alright, how many be now.

**Galina Davis**: . . . as of right now, she has like 108 reports that . . . that's due this week

that I would like to pick up.  I'm like, ok can you at least bring me the stuff you already

have and then I will try to find someone else.  In the mean time I mean you have 108

reports that have been sent to you.  I'd like to get them.  Nothing.  I don't hear from her.

. . .

**Marlon Caldwell**:  Okay, let me call around and I'll try to, I'll try to, when I'll try to call

you back later.  I'm gonna call around. . .

**Galina Davis**:  It's, you know, I gave her 700 dollars a week.  . . . .

**Galina Davis**:  I'll give you a thousand bucks, Marlon.

## Call between Galina Davis and Marlon Caldwell
## 10/13/16 at 11:45 a.m.

43.     Within minutes of the above call, Defendant Caldwell called Galina Davis and

told her he had found a replacement for Co-conspirator Terri Owens.  The replacement was

SLMPD Officer Mark Taylor.  Galina Davis told Caldwell she would pay him the promised

$1000, if Taylor agreed to provide information from the accident reports.  The following are

excerpts from the conversation between Galina Davis and Caldwell.

**Galina Davis**:  Hello?

**Marlon Caldwell**:  Yeah, Gale, I might, got, think I might of found your guy already.

**Galina Davis**:  Ooh, ooh, ooh, what is his schedule like?  And what is he willing to do?

**Marlon Caldwell**: . . . drives a cruiser, so I think he is on nights, kinda like Terri Owens was. So I gave him a little breakdown of what you told me, so you can, he said give you his number. You'd give him a call.

**Galina Davis:** Ok.

**Marlon Caldwell:** Ready to write his number down?

**Galina Davis**: What's his name?

**Marlon Caldwell**: Mark Taylor.

**Galina Davis**: Alright and he works nights and he drives the cruiser? So he has access to the computer right?

**Marlon Caldwell**: Yeah,

**Galina Davis**: Thanks, I would like to meet. Well, if it works and he, you know, he's on it, I mean, I, when I meet you and give you the money as promised.

**Marlon Caldwell**: Ok, you let me know.

**Galina Davis**: Yeah, I will. Thanks, Marlon.

### Call between Galina Davis and Defendant Mark Taylor
### 10/13/16 at 11:48 a.m.

44.     After the call with Caldwell, Galina Davis immediately called Defendant Mark Taylor. She described the information that she wanted from the accident reports and described how other officers had provided the information to her in the past. Galina Davis also stated that she usually requested about 100 accident reports per week. Galina Davis agreed that she would pay Taylor $7.00 per accident report that he provided. The following are excerpts from the recorded conversation between Galina Davis and Taylor:

**Galina Davis**:  [W]e started out with Marlon and we were writing them, and then now,

I'm was working with someone who decided no, she didn't want to be writing them and

then so she was printing them.

**Mark Taylor**:  Right.

**Galina Davis**:  But that's a lot of printing.  . . . It's like a lot of reports.  We're talking

about the neighborhood of around one hundred (100) a week. . . .

**Mark Taylor**:  Ok.  A hundred (100), alright . . .

**Galina Davis**:  So Marlon said something about you said, you know doing, you sending

by smart phone, anything, that's fine.       . . .

**Galina Davis**:  That's a lot of pictures though.

**Mark Taylor**:  That's no problem, ain't no problem.  Uh,  . . . that's what I was going to

try and do it just do it, . . I'll just send the pictures, send them by pictures through.  I take

a picture of it and send it straight to you.  And then, and then that way, once you get it, I

delete it then I can give you some more. . . .

**Mark Taylor**:  I guess maybe, I think it'd be a quicker process, I think it'd be a quicker

process if I could take the picture after each page and then send it to you and then you got

the whole thing and like that.

**Galina Davis:**  That would be awesome if you could do that.

**Mark Taylor**:  I told Marlon I would try do it at . . . seven dollars ($7.00), but that be

fine? . . .

**Galina Davis**:  I'll give you seven (7), if you want to, yeah. . . .

**Galina Davis**: You know it's something that we need ASAP.  It's something that I was

supposed to get today.  We normally would meet on Thursdays to pick it up.  Um, the

only thing, is ok, so how am I gonna see you to pay you and stuff like that?

**Call between Galina Davis and Dr. Davis**
**10/13/16 at 12:32 p.m.**

45.    Shortly after reaching an agreement with Defendant Mark Taylor, Galina Davis

called Dr. Davis and told him about her conversations with Defendant Caldwell and Defendant

Taylor.  The following are excerpts from the conversations between Dr. Davis and Galina Davis:

**Galina Davis**:  Yeah, Marlon found someone.

**Dr. Davis**:  Oh found someone else?

**Galina Davis**:  Well, thousand dollars speaks doesn't it.

**Dr. Davis**:  Well, well keep it a secret until you have the name, in case we're being

recorded.  Um.

**Galina Davis:**  I don't know . . . We'll see how it's gonna work out.  But so far it's been

pretty promising.

**Dr. Davis**:  Already?  How do you know did you talk to him?

**Galina Davis**:  Yeah, oh yeah.

**Dr. Davis**:  So you said you'd give him a thousand for the referral? . .

**Dr. Davis**:  And you think that's what did it?

**Galina Davis**:  Yeah, yeah.

**Dr. Davis**:  And what did he say?  He'd get on it right away?

**Galina Davis**:  You're right about the money.  He got him pretty quickly, within 10

minutes I had him, I had his name and number.

**Dr. Davis**:  He must need the money right away.  Why does he need the money so.

24

**Galina Davis:** . . . And then, and then soon as I said I give you a thousand bucks. And so, sure enough, he found someone quickly.

**Dr. Davis**: Oh yeah? I guess money talks.

### Call between Galina Davis and Dr. Davis
### 10/14/16 at 2:51 p.m.

46. On October 14, 2016, Galina Davis and Dr. Davis discussed how they would get the police reports from Defendant Mark Taylor. Dr. Davis told Galina Davis to pay Taylor $5.00, instead of $7.00 as previously agreed. Dr. Davis also wanted Taylor to write out the information, instead of photographing and emailing the entire report. The following are excerpts from this recorded conversation between Galina Davis and Dr. Davis:

**Dr. Davis**: Well . . . well give him [Mark Taylor] five instead of seven [dollars]. But he is just going to write down the address and phone number, and maybe the insurance company. He won't need to take pictures of everything. Just tell him write down address, phone number. Just tell him to write down address, phone number, and insurance company. . . . Just put vehicle. Just put one for vehicle one and Allstate. AS for Allstate. SF for State Farm. You get it.

### Text Messages between Galina Davis and Officer Mark Taylor
### 10/16/16

**Galina Davis**: Do you still want to meet tomorrow or finish at least another day so I can pay you for all of it?

**Mark Taylor**: Could u pay me for what I have done and I'll Finnish the rest tomorrow

**Galina Davis**: It will only be $357

### Text Messages between Galina Davis and Officer Mark Taylor
### 10/17/16

**Galina Davis**: Are we meeting at Brentwood Plaza by Whiole [Whole] Foods?

**Mark Taylor:** Yes, 2p.

**Galina Davis:** On my way should be there right by two.

## Call between Galina Davis and Dr. Davis
## 10/19/16 at 4:06 p.m.

47.    On October 19, 2016, Dr. Davis called Galina Davis and told her there was a patient at his office who worked for the police department who might be able to identify a police officer willing to provide accident reports. Dr. Davis told Galina Davis that she would have to pay the patient because as a chiropractor, he could not pay her. The following are excerpts of the conversation between Dr. Davis and Galina Davis:

**Dr. Davis:** She works as a custodian at the Met Police Department. She says she knows people. She's been there eight years. She said she could find someone. So, you just keep her cell phone number. Do you want me to give it to you? Do you have that 601 number?

**Galina Davis:** Does she have like a number? What if she disconnects this number? What if she changes number? Does she have another number like a home number, or, uh . . .

**Dr. Davis**: I don't know. I'll fax you the paper she fills out. She'll have an emergency contact. I'll fax you when she fills it out.

**Galina Davis:** Ask for her number.

**Dr. Davis**: I'll make sure she is an emergency contact and I'll fax that.

**Galina Davis:** What is she getting out of it though?

**Dr. Davis**: Yeah, I don't, you'll have to pay her something. I can't, didn't want to do it because I'm the chiropractor.

**Galina Davis:** Well, I have someone right now.

26

**Dr. Davis**: I know, but, but like, I told, ah, [lawyer J.W.] and he said he tried, but the police officer was working.

**Galina Davis:** He'll retire a year and we'll need somebody. . . .

**Dr. Davis**: This woman said she could find an offi . . .

**Galina Davis**: [interrupting] She knows, she knows, she knows officers?  And she knows what?

**Dr. Davis**: She knows lots of people.  She's been there eight years.  She says it doesn't have to be an officer.  It just has to be someone that works there, in the records room.  Just somebody making ten bucks an hour, you know, in the records room.

**Galina Davis:** They don't have access to that stuff?

## OVERT ACTS

48.     In furtherance of the conspiracy and to effect the objects of the conspiracy, the following overt acts, among others, were committed in the Eastern District of Missouri:

49.     On or about July 12, 2016, Terri Owens met Galina Davis on a parking lot on Lindell Blvd. near Sarah Street.  Galina Davis handed Terri Owens a manila envelope through the driver's side window of Terri Owens' vehicle.

50.     On or about August 21, 2016, Terri Owens had in her possession ten un-redacted accident reports which she intended to give to Galina Davis.

51.     On or about August 23, 2016, Galina Davis met with Terri Owens and paid her $663 for accident reports that Terri Owens delivered to Galina Davis.

52.     On or about August 26, 2016, Galina Davis gave Terri Owens $150 for 23 accident reports and received an additional 27 accident reports that Galina Davis had previously paid for.

53.　On or about October 12, 2016, Galina Davis telephoned SLMPD Officer Laqueshia Lewis and asked her if she would be "able to get some police reports for us."

54.　On or about October 12, 2016, Dr. Davis told Galina Davis: "you need to offer her [Officer Lewis] money" for information in the un-redacted accident reports.

55.　On or about October 12, 2016, Dr. Davis told Galina Davis to offer Defendant Caldwell "a thousand, cash" so Caldwell would have an incentive to identify a police officer willing to provide accident reports to them.

56.　On or about October 13, 2016, Galina Davis told Defendant Caldwell that she would give him $1000 if he identified a police officer willing to accept payments for un-redacted accident reports.

57.　On or about October 13, 2016, Defendant Caldwell gave Galina Davis the contact number for Defendant Mark Taylor, who was willing to provide accident reports to Galina Davis.

58.　On or about October 12, 2016, Dr. Davis told Galina Davis "to keep it [Mark "Taylor's name] a secret . . . in case we're being recorded."

59.　On or about October 17, 2016, Defendant Mark Taylor met Galina Davis on the parking lot of the Whole Foods store in Brentwood and received $357 for accident reports that he provided to Galina Davis.

60.　On or about October 21, 2016, Galina Davis met Defendant Taylor on the parking lot of the Target store in Brentwood and gave him cash.

61.　On or about October 21, 2016, Galina Davis met Defendant Caldwell on the parking lot of the Target store in Brentwood and gave him a white letter-sized envelope.

62.     On or about October 22, 2016, Dr. Davis contacted Galina Davis and told her not to send text messages to him:  "Yeah, every time you send me a text I have to go in my phone and erase it.  It takes me a minute.  Just send me faxes."

All in violation of Title 18, United States Code, Section 371.

The Grand Jury further charges that:

## COUNT 2
## BRIBERY
## 18 U.S.C. §§ 666(a)(1)(B) and 2

63.     Paragraphs 1 to 14 are incorporated by reference as if fully set out herein.

64.     Co-conspirator Galina Davis offered Co-conspirator Marlon Caldwell $1000 if he could identify a police officer willing to provide the un-redacted accident reports.  Galina Davis stated that she would pay for each report that the police officer provided.  Co-conspirator Marlon Caldwell received $1000 after he identified Defendant Taylor.

65.     Galina Davis offered, and Defendant Taylor agreed to accept, payments for each un-redacted accident report provided to Co-conspirator Galina Davis.  Both Defendant Taylor and Galina Davis knew that the SLMPD would not disclose un-redacted accident reports and the information contained in such reports to Galina Davis.

66.     Co-conspirator Galina Davis provided Defendant Taylor with a list or otherwise identified the accident reports that she wanted.  While on duty as a SLMPD police officer, Defendant Taylor used his user log-in name and password to access the SLMPD computers to obtain the accident reports for Galina Davis.  Defendant Taylor often accessed this information while in his patrol car.

67.     Defendant Taylor and Co-conspirator Galina Davis took measures to conceal the unauthorized disclosure of the accident reports.  As an example, on or about October 17, 2016,

Defendant Taylor met Galina Davis on the parking lot of the Whole Foods store in Brentwood and received $357 for accident reports that he provided to Galina Davis.

68.     Defendant Taylor was aware at all times that the money he received from Galina Davis was intended to influence and induce him to disclose accident reports, contrary to SLMPD policy.

69.     In or about October and November 2016, Defendant Taylor did accept and agree to accept, payments from Co-conspirator Galina Davis, in return for disclosing information concerning accidents, contrary to the policy of the St. Louis Metropolitan Police Department.

70.     In or about October and November 2016, in the Eastern District of Missouri,

**MARLON CALDWELL and MARK TAYLOR,**

the defendants herein, did corruptly solicit and demand for the benefit of Defendant Taylor, a police officer and agent of the St. Louis Metropolitan Police Department, and did accept and agree to accept, a thing of value from a person, intending that Defendant Taylor would be influenced and rewarded, in connection with a transaction and series of transactions of the St. Louis Metropolitan Police Department, involving $5,000 or more.

All in violation of Title 18, United States Code, Sections 666(a)(1)(B) and 2.

A TRUE BILL.

_____
FOREPERSON

JEFFREY B. JENSEN
United States Attorney

_____
DOROTHY L. McMURTRY, #37727MO
Assistant United States Attorney

30